## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| GERMAINE SMITH-BEY, # 405083,    * | |
|   SID # 1934109     * | |
|     * | |
| Plaintiff     * | |
|     * | |
| v.     * | Civil Action No. JKB-15-1921 |
|     * | |
|     * | |
| JENNIFER PETTERSON,     * | |
| BRUCE FORD, P.A.,     * | |
| JASON CLEM,     * | |
| TERRI DAVIS, P.A.,     * | |
| PAUL MATERA, M.D.,     * | |
| OLALEYE OLADIPO,     * | |
|     * | |
| Defendants     * | |

*** 

## MEMORANDUM

Germaine Smith-Bey filed suit under 42 U.S.C. § 1983, claiming that defendants, medical providers at Maryland Division of Correction facilities, provided him constitutionally inadequate medical treatment. ECF 1. Pending is a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment filed by counsel on behalf of defendants Jennifer Patterson, R.N.,[1] Bruce Ford, P.A., Jason Clem, M.D., Terri Davis, P.A., Paul Matera, M.D., and Oladipo Olaleye, P.A.[2] ECF 10. Smith-Bey, who is self-represented, filed an opposition to which defendants have replied. ECF 13, 17. Thereafter, Smith-Bey filed a second opposition response and attachments to defendants' dispositive motion. ECF 18.

---

[1] The docket shall be amended to reflect this defendant's surname is spelled Patterson as shown in her affidavit. ECF 10-6.

[2] The docket shall also be amended to reflect this defendant's name as Oladipo Olaleye as shown in the medical records.

The case is briefed and ready for disposition.  After considering the pleadings, exhibits, and applicable law, the court finds a hearing unnecessary.  *See* Local Rule 105.6 (D. Md. 2014).  For reasons to follow, defendants' dispositive motion (ECF 10), treated as a motion for summary judgment, will be granted, subject to submission of a status report indicating if and when Smith-Bey was provided ACL repair surgery.

## BACKGROUND

### I.    Plaintiff's Claims

Smith-Bey, an inmate in the custody of the Maryland Division of Correction who is presently housed at the Maryland Correctional Institution in Hagerstown, Maryland (MCI-H"), filed this complaint on June 29, 2015.[3]   Smith-Bey alleges defendants, who are medical providers employed by Wexford Health Sources, Inc., a private medical contractor that provides medical services to inmates at state facilities under contract with the State of Maryland (ECF 10-3 at 10), violated his rights under the Eighth Amendment to the United States Constitution by providing him inadequate medical treatment for a torn ACL[4] in his left knee.  ECF 1.  He alleges that the long delays in returning him for a follow-up visit after surgery resulted in deterioration of the condition of his knee.  *Id.* at 15.  He also avers that he was improperly removed from work duty in retaliation for filing an Administrative Remedy Procedure ("ARP") request against Jennifer Patterson.  *Id.*  He seeks one million dollars in compensatory damages and one million dollars in punitive damages.  *Id.*

---

[3]  Smith-Bey filed the complaint as a declaration.  ECF 1 at 18.

[4]  A meniscal tear is an injury of the shock-absorbing cartilage in the knee.  The meniscus is a C-shaped fibrous cartilage that is found in certain joints forming a buffer between the bones.   https://www.nlm.nih.gov/ medlineplus/ency/imagepages/9621.htm.  An anterior cruciate ligament ("ACL") injury is the over-stretching or tearing of the anterior cruciate ligament (ACL) in the knee.   A tear may be partial or complete. https://www.nlm.nih.gov/medlineplus/ency/article/ 001074.htm.

## II.      Treatment History

The following facts are presented in the light most favorable to Smith-Bey, the nonmoving party.  Smith-Bey's medical history includes meniscal and ACL tears to his left knee, conditions he attributes to an injury suffered prior to incarceration.  ECF 11-2 at 3.  The verified and undisputed medical records provided by defendants demonstrate the following chronology of care.

On July 23, 2013, Smith-Bey was seen by Bruce Ford, P.A., for a scheduled medical visit to consider his request to return to his prison job.  Smith-Bey presented complaints of left knee pain and stated his knee "gave out" at times.  Ford ordered x-rays and prescribed Naprosyn, a nonsteroidal anti-inflammatory drug (NSAID).  *Id*. at 1; ECF 10-3 n. 1.

On August 6, 2013, Ford saw Smith-Bey for complaints of left knee pain.  The x-rays taken of his knee were negative.  Ford observed Smith-Bey's left knee was positive for tenderness and moderate pain with motion.  Ford reordered Naprosyn and prescribed a knee brace.  Ford wrote on the medical chart that he would consult Dr. Matera regarding possible cortisone injections.  ECF-11-2 at 3, 4.

On August 12, 2013, Terri Davis, P.A., examined Smith-Bey for complaints of left knee pain.  Smith-Bey reported his left knee gave out and felt like it was twisted while walking.  Smith-Bey complained Naprosyn was ineffective, but asked to continue it because he believed that nothing stronger would be prescribed for him.  He complained he was assigned to a top bunk in his cell.  Physical examination revealed some edema, but no locking, popping, or ligamentous laxity.  Mild tenderness in the left knee was noted.  Davis informed Smith-Bey that based on the examination an order for bottom bunk status was not indicated.   Additionally, Davis

administered a steroid injection to Smith-Bey's left knee.  *Id*. at 5.  Smith-Bey reported feeling immediate relief after the injection.

On September 25, 2013, Paul Matera, M.D., saw Smith-Bey for left knee pain.  Smith-Bey stated he sustained the knee injury in 2002[5] after he jumped off a wall and twisted his knee. Matera noted a knee brace had been ordered and x-rays results were negative.  Smith-Bey reported that prior to his incarceration, he was to receive physical therapy for his knee, but was incarcerated before it could begin.  He also reported the steroid injection helped him for three weeks and NSAIDs were of some help.  He reported that he works at a prison job and walks for exercise.  *Id*. at 9.  Matera's physical examination of Smith-Bey revealed moderate pain with stiffness.  Matera found Smith-Bey had no instability and had a full range of motion.  Matera placed Smith-Bey on bottom bunk status for three months while he received knee injections.  *Id*. at 10.

On October 10, 2013, Matera administered a steroid injection to Smith-Bey's left knee. *Id*. at 11.  This was Smith-Bey's second injection to the left knee, and a third injection would not be offered until February 14, 2014, if one was needed.  *Id*. at 12.

On October 21, 2013, Smith-Bey was seen by Kathy Killmoon, R.N., for complaints of knee pain.  He reported the steroid injection was ineffective and asked to see Dr. Matera.  When Killmoon explained that under medical policy she could refer him to a midlevel provider but not directly to Dr. Matera, Smith-Bey stated "I don't want to see anyone then."  *Id*. at 13.

On October 29, 2013, Smith-Bey reported to Laesha Kellam, R.N., that his most recent steroid injection was ineffective.  He reported experiencing extreme pain since the injection and

---

[5]   It is unclear whether the injury was suffered in 2002 or 2009.  *See e.g*., ECF 10-4 ¶ 4.  The date of injury is not at issue.  Neither party disputes the injury was sustained prior to Smith-Bey's incarceration.

pain when walking.  He reported he was unable to work on several occasions.  He also informed her that he had yet to receive his knee brace.  *Id*. at 14.

On November 7, 2013, Smith-Bey reported his left knee pain was increasing and he had difficulty standing since his most recent injection.  Smith-Bey had neither received his knee brace nor been given bottom bunk status.  Terri Davis, P.A., told him that the knee brace had been ordered several times and Dr. Matera recommended him for bottom bunk status for three months.  *Id.* at 16.  Davis requested a physical therapy consultation for Smith-Bey.  *Id*. at 17.

On November 24, 2013, Smith-Bey presented knee pain complaints to Laesha Kellam, R.N.  He indicated he was having difficulty walking and getting to meals.  He was placed on activity restriction with meals in his cell until cleared by a medical provider.  *Id*. at 18.

On December 3, 2013, Smith-Bey reported to Bruce Ford, P.A., that physical therapy was not helping his knee pain.  Ford told him that he had to complete physical therapy in order to be considered for further treatment.  Smith-Bey reported he had yet to receive his knee brace.  Ford noted the knee brace had been ordered multiple times.  Ford ordered x-rays of Smith-Bey's left knee and lumbar spine.  *Id*. at 20, 21.

On December 16, 2013, Ford submitted a request for Smith-Bey to be seen by an orthopedist.  *Id*. at 163-164.  Ford also prescribed Gabapentin.  *Id*. at 23.  Defendants explain Gabapentin is a medication that may be used to treat nerve pain.  *Id*. at 6, n. 5.

On December 23, 2013, Smith-Bey received a knee brace.  *Id.* at 202.

On January 7, 2014, Dr. Manning, an orthopedist, examined Smith-Bey and recommended an MRI to rule out a meniscus tear.  Manning indicated it was likely that Smith-Bey required arthroscopic surgery.  *Id*. at 185.

On January 14, 2014, Smith-Bey was placed on bed rest, and a medical order to provide meals to him in his cell ("feed-in") was issued.

On January 19, 2014, Smith-Bey informed Terri Davis that the orthopedist had recommended an MRI of his left knee.  Davis noted on the medical chart that she could not find documentation of the orthopedist visit and sent a request for additional information.  *Id*. at 22.  Davis indicated that she would contact Smith-Bey to let him know when the MRI request was written.  She continued Smith-Bey on bottom bunk placement for six months and discontinued his bed rest and feed-in orders.  *Id*. at 23.

On February 13, 2014, Dr. Matera examined Smith-Bey.  Smith-Bey declined Matera's recommendation to be placed on no work status and asked when he would receive the MRI.  *Id*. at 24.  Smith-Bey reported experiencing pain at a level of 5 out of 10 with it increasing to 7 out of 10 by the end of the day.  Matera observed Smith-Bey's "gait was stable with slight antalgia,[6] no gross instability."  Matera prescribed Ultram for pain relief and ordered the MRI.  *Id*.

On February 21, 2014, Smith-Bey asked to be placed on bedrest and feed-in.  He stated he was in too much pain to walk and his knee kept giving out.  Nurse Kellam wrote orders to place him on these medical restrictions.  *Id*. at 26.

On April 2, 2014, Smith-Bey received an MRI at Bon Secours Hospital in Baltimore.  *Id*. at 190.  The MRI showed tears of the medial and lateral meniscal ligaments.  *Id*.  A complete tear of the ACL was also observed.  *Id*.

---

[6] Antalgia is assuming a specific posture or gait so as to avoid or lessen pain.  http://www.merriam-webster.com/medical/antalgic.

On April 17, 2014, Dr. Matera entered an administrative note on Smith-Bey's medical chart indicating Smith-Bey was scheduled for an orthopedic follow-up visit with Dr. Manning. *Id*. at 27.[7]

On May 8, 2014, Carl Oltman, P.A., renewed Smith-Bey's Ultram prescription and added Indomethacin, a NSAID, to his medication regimen.  ECF 10-3 n. 8.  The medical chart reads "Left knee limited ROM [range of motion], severity is severe, associated with pain, worse with movement, improved by rest, status is worse."  *Id*. at 28.  Oltman reported Smith-Bey was approved for surgery with Dr. Krishnaswamy at Bon Secours Hospital.  *Id*. at 28.  Defendants postulate that Oltman most likely meant to say that Smith-Bey was approved for a consultation for possible ACL surgery with Dr. Krishnaswamy.  ECF 10-3 n.7.

On June 5, 2014, Dr. Matera noted on Smith-Bey's medical chart that an orthopedic consultation had been scheduled.  Against Matera's medical recommendation, Smith-Bey declined to be placed on no work status and also declined to use crutches.  Dr. Matera reviewed and continued Smith-Bey's medications.  ECF 11-2 pp. 30-31.

On June 13, 2014, Dr. Ashok Krishnaswamy's examination of Smith-Bey revealed the left knee showed a range of motion between 20 and 110 degrees with positive Lachman and drawer signs.[8]  Moderate crepitus[9] was also observed in the left knee joint.  X-rays and an MRI revealed left knee arthritis with a tear of the left anterior and medial crucial ligaments.  Dr. Krishnaswamy advised Smith-Bey that he first required arthroscopic knee surgery to correct the internal derangement and to examine the extent of the arthritis of the knee.  Dr. Krishnaswamy

---

[7]  There is no record the follow-up visit took place.

[8]  Defendants explain that Lachman and drawer signs are tests to identify the integrity of the ACL.  Drawer sign is also used to identify the integrity of the posterior cruciate ligaments.  ECF 10-3 nn.9-10.

[9] Defendants explain crepitus, a peculiar cracking, crinkly, or grating feeling or sound under the skin or in the joints, indicates cartilage wear in the joint space.  ECF 10-3 n. 11.

recommended that Smith-Bey "have arthroscopic surgery of the left knee soon." *Id.* at 172. If the arthritis was mild, Dr. Krishnaswamy indicated Smith-Bey might require an ACL repair at a future time. If the arthritis was moderate, there was no benefit from ACL reconstruction. Dr. Krishnaswamy explained he usually refers ACL repair procedures to University Hospital[10] for surgery. *Id.* at 172-77. In his complaint, Smith-Bey states Dr. Krishnaswamy told him "the long delays in me getting back in to see him about my ACL tear has [sic] my knee to deteriorate much further than when he first examined me." ECF 1 at 15.

On June 24, 2014, Dr. Matera saw Smith-Bey for his preoperative health assessment. ECF 11-2 at 32-34.

On July 1, 2014, Bruce Ford, P.A., saw Smith-Bey for pre-operative evaluation and cleared him for arthroscopic surgery. *Id.* at 35-36.

On July 15, 2014, Dr. Krishnaswamy performed arthroscopic surgery on Smith-Bey at Bon Secours Hospital. *Id.* at 178-79. Smith-Bey's arthritis was observed in the early stages. *Id.* Krishnaswamy recommended physical therapy, a patella stabilizing knee brace, and a follow-up visit in five weeks. *Id.* at 180.

On July 16, 2014, Smith-Bey was admitted to the prison infirmary for post-surgical treatment. *Id.* at 40-42. Medical providers placed Smith-Bey on bedrest and feed-in, and approved him for wheelchair use to visit the medical unit. *Id.* at 37. He was ordered physical therapy and prescribed Percocet for one week. *Id.*

On July 17, 2014, Jason Clem, M.D., discharged Smith-Bey from the infirmary. Notes on the medical chart by Angela Walston, RN, read that Smith-Bey rated his pain as 8 out 10. *Id.* at 43. After Ultram was administered, he reported the pain lessened to 4 out of 10. *Id.* The

---

[10]   The court shall assume the reference was to the University of Maryland Medical Center.

notes indicate Smith-Bey was able to walk with a cane and Ultram controlled his pain.  The notes read, "[l]eft knee swelling, severity is moderate, associated with pain, status is stable."  *Id*. at 44. Smith-Bey claims he expressed the need to remain in the infirmary longer, but his request was denied.  He explains that once he left the infirmary, no one would provide him with proper medical care.  ECF 1 at 13.

On July 19, 2014, Smith-Bey was readmitted to the infirmary due to concerns of infection.  Angela J. Scheib, RN, observed drainage on the gauze placed between the ACE wrap and dressing on Smith-Bey's knee.  Smith-Bey reported sweating and expressed concerns about increased drainage at the site of the surgery.  ECF 11-2 at 46.  The medical chart noted there were "no orders for dsg change.  Area warm to touch with edema from knee to foot."  *Id*. at 46. Smith-Bey was intravenously administered Rocephin, an antibiotic, for three days.  *Id*. at 52; ECF 10-3 n.16.  Smith-Bey avers his bandages had not been changed or cleaned for two days prior.  ECF 1 at 13.  The following day, he again went to the medical unit because no one had come to change his dressings.  *Id*.

On July 25, 2014, Mahboob Ashraf, M.D., placed an administrative note on Smith-Bey's medical chart to change his dressings daily.  ECF 11-2 at 53.

On August 6, 2014, Peter Stanford, P.A., saw Smith-Bey for a follow-up visit.  Smith-Bey reported his left knee pain level was 7 or 8 out of 10, with the pain radiating to the buttock. He indicated crutches were not helpful, and a cane might prove more functional.  Smith-Bey said he had not received physical therapy.  Additionally, he asked for a brace to support his knee. Stanford observed the left knee was tender but not swollen with a reduced range of motion.  *Id*. at 54.  He assessed Smith-Bey's stability without crutches as "fair."  *Id*.  Stanford discontinued

orders for crutches, bedrest, and feed-in and ordered a cane, knee brace, and physical therapy consultation for Smith-Bey. Stanford also ordered an orthopedic follow-up visit. *Id.*

On August 13, 2014, during a follow-up visit, Smith-Bey reported to Stanford that he had not been provided a knee brace or cane. He reported his pain at a 4 or 6 out of 10. Smith-Bey denied heat, swelling, or locking around the knee. Stanford reordered the knee brace and cane and submitted a consultation request for physical therapy. *Id.* at 56, 166-67. Stanford's notes read in part "Needed PT per Ortho; no consult on EPHR. Pt. awaiting PT." *Id.*

On August 22, 2014, Bruce Ford, P.A., informed Smith-Bey that consultation requests were placed for both physical therapy and orthopedic follow-up. Ford sent a knee brace request form to the Director of Nursing and sent an e-mail concerning the status of the physical therapy consultation. *Id.* at 58.

On September 5, 2014, Craig Joachimowski, a physical therapist, evaluated Smith-Bey who reported ongoing left knee pain as well as pain and muscle cramping and low back pain. Joachimowski noted anterior instability and swelling. He recommended electronic stimulation treatment and active and passive exercises. *Id.* at 186.

On September 8, 2014, Smith-Bey told Laesha Kellam that he had been in severe pain since he moved to another cell four days earlier. He complained of new pelvic pain and chronic bilateral leg and back pain. Smith-Bey stated that he had been in physical therapy. Smith-Bey stated "I told PT about my pain and they said I needed to follow-up with the doctor." *Id.* at 60.

On September 11, 2014, Dr. Paul Matera saw Smith-Bey and reordered his medications. Smith-Bey said the ACE bandage he was provided was difficult to use. Matera found a knee support for Smith-Bey in a medical closet. Smith-Bey tried the support, found it helpful, and indicated he would use it until provided with the brace on order. *Id.* at 62.

On September 29, 2014, Smith-Bey complained to Bruce Ford, P.A., about new knee and back pain.  Ford gave Smith-Bey a smaller knee brace.  Ford placed Smith-Bey on "general lay-in" with no work or yard activity.  *Id*. at 64-65.

On October 12, 2014, Smith-Bey received and signed for an elastic knee brace.  *Id*. at 211.

On October 29, 2014, Smith-Bey informed Peter Stanford, P.A., during a medical visit that he needed additional surgery.  Smith-Bey asked Stanford to discontinue the order for a cane and to permit him to return to work.  Stanford discontinued the cane and cleared Smith-Bey to return to his prison job.  *Id.* at 66.  Stanford observed Smith-Bey had completed physical therapy with some improvement.  *Id*.

On November 12, 2014, Smith-Bey informed Dr. Matera that his left knee was still sore.  Smith-Bey had not received the knee brace ordered for him.[11]  Smith-Bey said the small brace Dr. Matera had found in a closet was no longer effective, and he "traded" it for the "old patella stabilizer" he was wearing.  *Id*. at 68.  Matera noted Smith-Bey needed a follow-up visit with the orthopedic surgeon and the brace had been ordered multiple times.  *Id*.

On November 24, 2014, Bruce Ford submitted an orthopedic consultation request for Smith-Bey.  *Id*. at 168-69.

On December 8, 2014, Smith-Bey complained of feeling a sharp pain in his knee when leaning forward the night before, and since then was unable to walk with crutches.  After consulting with Dr. Clem, Ford admitted Smith-Bey into the infirmary until he could ambulate with crutches.  Smith-Bey was prescribed Percocet.  *Id*. at 70-72.

On December 9, 2014, Dr. Clem examined Smith-Bey in the infirmary.  *Id*. at 76-77.  Smith-Bey reported that several days before, he felt a popping sound in the area of his left

---

[11]  Apparently, the knee brace Smith-Bey received on October 12, 2014, was not the one prescribed for him.

hamstring when he bent forward from a seated position.  Smith-Bey indicated his knee occasionally gave out.  Clem observed Smith-Bey's left knee was swollen.  Nursing notes completed the same day indicate Smith-Bey rated his pain at 10 out of 10 and stated "[m]y knee is killing me."  *Id.* at 74.

On December 10, 2014, Dr. Clem discharged Smith-Bey from the infirmary.  Smith-Bey reported continuing pain.  Clem reported the left knee had mild swelling.  The medical chart reads "will suggest f/u visit with ortho dr. K [rishnaswamy]."  *Id.* at 78.

On December 22, 2014, Bruce Ford readmitted Smith-Bey to the infirmary for complaints of increased pain and instability.  A collegial review[12] of Smith-Bey's case requested input from Dr. Krishnaswamy regarding further treatment.  *Id.* at 89.  It was noted that Krishnaswamy had been on vacation and just returned Dr. Clem's phone call.  *Id.* Krishnaswamy recommended that he see Smith-Bey to determine if "further scope ACL work is needed and if recent injury caused permanent damage."  *Id.*  Smith-Bey remained in the infirmary through December 30, 2014.  *Id.* at 91-118.

On January 5, 2015, Smith-Bey was transferred to Patuxent Institution.  *Id.* at 122.

On February 27, 2015, Dr. Krishnaswamy examined Smith-Bey at Bon Secours Hospital. Krishnaswamy determined Smith-Bey needed an ACL repair, and referred him to University Hospital for the procedure.  *Id.* at 181.

On March 3, 2015, Oladipo Olaleye, RNP, updated Smith-Bey's medical chart to indicate he was to be provided a patellar brace and scheduled for ACL repair.  *Id.* at 128, 170-71.

On April 7, 2015, Smith-Bey asked Nurse Olaleye to check the status of his ACL surgery.  *Id.* at 130.

---

[12] Defendants provide no information about collegial review.

On July 8, 2015, Smith-Bey complained to Nurse Olaleye that his pain was an 8 out of 10 and the knee brace was not helping.  It was noted that correctional staff had removed the metal support from the knee brace due to security concerns.  Olaleye wrote an order to replace the metal inserts in the knee brace and indicated Smith-Bey was scheduled to see an orthopedist later that week.  *Id*. at 137.

On July 24, 2015, Ralph Frank Henn III, M.D., examined Smith-Bey at Kernan Hospital.[13]  Nurse Olaleye updated Smith-Bey's medical chart as follows:

> Post Orthopedic Visit.  Inmate was seen at Kernan Orthopedic and Rehabilitation today for left knee ACL reconstruction.  He was seen by Dr. Henn [contact information omitted], and he would be scheduled for ACL repair.  There is request for MRI of his knee done at BSH [Bon Secours Hospital] be sent to Kernan Hospital.  Inmate was informed to continue the knee brace that provide [sic] medical and lateral support before surgery.

*Id*. at 140.

On August 6, 2015, Nurse Olaleye submitted a request for an ACL repair procedure for Smith-Bey.  *Id*. at 144.

On August 12, 2015, Smith-Bey was transferred from Patuxent Institution to MCI-H. ECF 5.

On August 19, 2015, Smith-Bey complained to Obianuju Emy-Munonye, RN, that his pain medications were not alleviating his left knee pain.  He rated his pain as 9 out of 10.  He asked when he would have his knee surgery.  *Id*. at 147.  The nurse observed Smith-Bey's gait was unsteady.  *Id*.

On August 29, 2015, Smith-Bey was seen by Kelly Bickford, RN, at MCI-H concerning his request for bottom bunk status. [14]  *Id*. at 150-51.  The record indicates Smith-Bey informed

---

[13]  The court takes notice that Kernan Hospital, now called the University of Maryland Rehabilitation and Orthopaedic Institute, is part of the University of Maryland Medical System.  http://umrehabortho.org/.

her, "I blew my knee out in 2002.  I was supposed to have surgery on the 26th but I got transferred to MCI."  *Id.* at 150.  The nurse wrote that Smith-Bey became confrontational and demanded to be seen by a physician.  He was asked to leave the medical area and did so.  Smith-Bey left ambulatory and in no physical distress.  *Id.*

On September 4, 2015, Smith-Bey was brought to the medical office on a stretcher.  Lori Slavick, P.A., wrote on the medical chart that a "consult was sent in for collegial at Patuxent and is pending at present time."  *Id.* at 152.  Slavick ordered x-rays of the right and left knees and wrote for a follow-up visit in two weeks.  *Id.*  The x-rays showed no signs of acute fracture or dislocation.  *Id.* at 154.

On September 17, 2015, Slavick performed Smith-Bey's preoperative assessment.  *Id.* at 155-156.

On September 24, 2015, Smith-Bey was transported to the University of Maryland Medical System for his scheduled ACL repair.  Upon arrival, there was no record that the surgery had been scheduled.  *Id.* at 157.

Dr. Henn, the orthopedic surgeon, has since refused to continue treating Smith-Bey.[15] ECF 5 ¶ 5 (aff. of Colin Ottey, M.D.).  A new orthopedic surgeon had to be identified and scheduled to treat Smith-Bey.  *Id.*

On October 22, 2015,[16]  Smith-Bey was sent to Roy J. Carls, an orthopedic surgeon, for evaluation.  Smith-Bey was scheduled for an ACL repair to be performed by Dr. Carls.  ECF 5.

---

[14]  It thus appears that Smith-Bey was transferred from Patuxent Institution to MCI-H during this time.

[15]  The reason for Dr. Henn's decision is not set forth in the record.

[16]  The declaration reads Smith-Bey was sent to Dr. Carls on October 22, **2014**.  ECF 5 ¶ 17.  In light of the chronology of treatment, the court assumes the date in the declaration is inadvertent error, and the correct date is October 22, **2015**.  (Emphasis added).

On or about November 20, 2015, Smith-Bey was approved for ACL reconstructive surgery to be performed by Dr. Carls.  ECF 17-1, 17-2.  Pending surgery, Smith-Bey continues to have regular access to prison medical staff for his knee condition, and may seek more immediate medical treatment by using the prison sick call system.  ECF 5 ¶ 20.  The record does not reflect if and when the surgery was performed.

## ANALYSIS

Defendants seek dismissal or summary judgment of Smith-Bey's claim that the medical treatment they provided amounted to "deliberate indifference" to his serious medical needs and thereby violated his Eighth Amendment rights.   Further, Jennifer Patterson seeks summary judgment in her favor as to Smith-Bey's claim she unlawfully retaliated against him for filing an ARP related to his medical care.  As noted, Smith-Bey submitted the complaint as a declaration.  *See supra* note 2.  As defendants have filed affidavits and copies of medical and prison records for the court's review, their dispositive motion will be construed as a motion for summary judgment.

Summary judgment is governed by Federal Rule of Civil Procedure 56(a), which provides:  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting former Rule 56(e)). The court should "view the evidence in the light most favorable to ... the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

In considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id.* at 252.

The moving party bears the burden of showing that there is no genuine issue as to any material fact. No genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof. *See Catrett*, 477 U.S. at 322–23. Therefore, on those issues on which the nonmoving party has the burden of proof, it is his responsibility to confront the summary

judgment motion with an affidavit or other similar evidence showing that there is a genuine issue for trial.

## I.        Eighth Amendment Medical Claim

The Eighth Amendment prohibits cruel and unusual punishment.  U.S. Const. amend. VIII. A prison official violates the Eighth Amendment when the official shows "deliberate indifference to serious medical needs of prisoners."  *Estelle v. Gamble,* 429 U.S. 97, 104; *see also Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014).   A deliberate indifference claim consists of two components, objective and subjective.  *Jackson*, 775 F.3d at 178.   Objectively, the inmate's condition must be "serious," or "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Id.* (quoting *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008)); *see also Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975) (per curiam) ("Questions of medical judgment are not subject to judicial review.").   Subjectively, "[a]n official is deliberately indifferent to an inmate's serious medical needs only when he or she subjectively 'knows of and disregards an excessive risk to inmate health or safety.'"   *Jackson*, 775 F.3d at 178 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).   "[I]t is not enough that an official *should* have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction."  *Id*. (emphasis in original).

If a risk is obvious, a prison official "cannot hide behind an excuse that he was unaware of a risk, no matter how obvious."  *Brice v. Va. Beach Corr. Ctr*., 58 F.3d 101, 105 (4th Cir. 1995); *see also Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015).   "A prison official's subjective actual knowledge [of a risk] can be proven through circumstantial evidence . . . ."

*Makdessi*, 789 F.3d at 133.   Disagreement between an inmate and a medical provider about the proper course of treatment do not establish an Eighth Amendment violation in the absence of exceptional circumstances.   *See Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985); *Wester v. Jones*, 554 F.2d 1285, 1286 (4th Cir. 1979) (per curiam) (A doctor's "failure to exercise sound professional judgment [does] not constitute deliberate indifference to serious medical needs.").

Although the Eighth Amendment proscribes deliberate indifference to a prisoner's serious medical needs, it does not require that a prisoner receive medical care by a provider of his choice.   The right to medical treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable."   *Bowring v. Godwin*, 551 F.2d 44, 47-48 (4th Cir. 1977).   Moreover, "any negligence or malpractice on the part of the doctors in missing the diagnosis does not, by itself, support an inference of deliberate indifference."   *Johnson v. Quinones*, 145 F.3d 164, 166 (4th Cir. 1998).

Defendants do not dispute that Smith-Bey's knee condition is serious and painful.   They deny they acted with the requisite "deliberate indifference" to his medical needs.   Defendants assert they have provided and continue to provide ongoing care for Smith-Bey and contend his allegations reflect mere disagreement concerning the appropriate timing for receiving various treatments for his left knee.

Dr. Clem attests Smith-Bey has received "ample, medically appropriate" care for his left knee.   ECF 10-4 ¶ 2 (aff. of Jason Clem).   This medical care has included x-rays, MRIs, physical therapy, orthopedic consultations, pain medications, steroid injections, assistive devices (brace, cane, crutches, wheelchair), hospitalization, infirmary admission, medical orders for bed rest, feed-in, and lower bunking, frequent visits and evaluations by medical staff, and arthroscopic

surgery.  Clem notes Smith-Bey has been approved for ACL repair surgery.  ECF 10-4.  Clem states that it is his opinion "to a reasonable degree of medical probability that the conservative treatment provided to Plaintiff for his knee injury prior to surgical intervention was medically appropriate and within the applicable standard of care."  *Id*.  ¶ 59.  Clem opines "to a reasonable degree of medical probability" Smith-Bey's post-surgical care was appropriate and within the applicable standard of care.  *Id*. ¶ 60.

Colin Ottey, M.D., Medical Director of Maryland prison facilities in Hagerstown, including MCI-H, attests it is his opinion "to a reasonable degree of medical probability that the conservative treatment provided to Plaintiff for his knee injury pending surgical intervention was medically appropriate and within the applicable standard of care.  ACL surgery is generally elective in nature and not an emergent procedure."  ECF 10-5 ¶ 19 (aff. of Colin Ottey).  Additionally, Ottey opines the medical care Smith-Bey received between July 8, 2015, when Nurse Olaleye submitted a consultation for the ACL repair evaluation and October 22, 2015, when Smith-Bey was approved for ACL surgery to be performed by Dr. Carls, was medically appropriate and within the applicable standard of care.  *Id*. ¶ 18.

The uncontroverted facts establish Smith-Bey complained about his left knee on July 23, 2013.  For five months, he continued to complain about worsening left knee pain and was treated with medication and steroid injections.  He was prescribed a brace, but none was provided to him.  A request for a physical therapy consultation was also submitted, although he was provided no physical therapy during this time period.  On January 7, 2014, Smith-Bey was evaluated by an orthopedist who indicated it was likely that arthroscopic surgery was needed and recommended an MRI.  Three months later, on April 2, 2014, the MRI was performed.  Based on those results, Smith-Bey was approved for a surgical consultation with Dr. Krishnaswamy.  On June 13, 2014,

Smith-Bey was evaluated by Krishnaswamy and recommended for arthroscopic surgery. One month later, on July 15, 2015, the surgery was performed at Bon Secours Hospital.

Smith-Bey's post-operative recuperation was difficult. He was admitted to the prison infirmary, discharged, and then readmitted for eleven days for treatment of infection. After discharge, he continued to complain of pain and difficulty walking. He was provided pain medication, an ACE bandage, a cane, and placed on feed-in. On August 6, 2014, Peter Stanford submitted an order for a knee brace with velcro strips and a patella hole for Smith-Bey. On August 13, 2014, Ford resubmitted the order for the brace and requested physical therapy for Smith-Bey. On August 22, 2014, Bruce Ford resent requests for the knee brace and physical therapy. Ford also indicated consultation requests had been placed for physical therapy and a follow-up orthopedic consultation. On September 5, 2014, Smith-Bey started a course of physical therapy. He continued to receive pain medication.

Smith-Bey repeatedly informed medical providers he was continuing to experience pain and difficulty walking despite the nonsurgical modalities he received. On November 24, 2014, Ford placed another request for an orthopedic consultation for Smith-Bey. On December 8, 2014, Smith-Bey was admitted to the infirmary for severe knee pain and was unable to walk. He was readmitted less than two weeks later, on December 22, 2014, for knee pain. Another request for an orthopedic consultation was submitted.

Dr. Krishnaswamy evaluated Smith-Bey on February 27, 2015, three months after Ford placed the consultation request. Krishnaswamy indicated Smith-Bey required ACL repair and referred him to University Hospital. Another five months elapsed before Smith-Bey was evaluated for ACL surgery by Dr. Henn at Kernan on July 24, 2015. Smith-Bey was transferred

to Patuxent Institution in August 2015. [17]   He was transported to the wrong surgical facility for

surgery the following month.[18]   Thereafter, efforts were made to reschedule his surgery, and as

of October 22, 2015, his surgery with Dr. Carls was pending.

Given this chronology of events, it is clear defendants have provided Smith-Bey

continuing medical care for his knee, which does not suggest subjective recklessness necessary

to show a constitutional violation.   It is also true that defendants' requests to provide orthopedic

consultations, physical therapy, and a knee brace, in some instances, took months to process.

There is no evidence, however, that defendants disregarded excessive risk to Smith-Bey's health

or safety, as is necessary to prove an abridgement of constitutional moment.   Indeed, the record

suggests defendants themselves may have been frustrated with the time lags between their

submission of requests for Smith-Bey's care and his receipt of the services and devices

requested.   *See e.g.*, ECF 11-2 at 20, 21 (Bruce Ford indicates he ordered the medical brace

multiple times).   While there is no explanation as to why Smith-Bey did not receive his five-

week surgical follow-up, medical providers requested further orthopedic evaluation for him as

his condition indicated.   *See e.g.*, ECF 11-2 at 78 (Clem's notes stating "will suggest f/u visit

with ortho dr. K[rishnaswamy]").

Under these circumstances, no genuine issue of material fact is presented to suggest that

any defendant acted with requisite deliberate indifference to hinder or delay Smith-Bey's receipt

of prescribed treatment, and defendants are entitled to summary judgment in their favor as a

matter of law.

---

[17]   The court takes notice that matters of inmate transfer are made by correctional administrators, not medical providers.

[18]  The court takes notice that Kernan Hospital and the University of Maryland Medical Center are in different locations.

## II.    Retaliation Claim

Smith-Bey also complains that Nurse Patterson retaliated against him for filing an ARP related to his medical care and changed his work status because he refused to "sign off" on the ARP.  ECF 1.  Patterson has submitted an affidavit, attesting medical providers do not have authority to alter an inmate's work status classification.  She notes that medical providers may make recommendations based on the inmate's medical needs to case management staff.  ECF 10-6 ¶ 3.  The ultimate decision to change a prisoner's work status classification rests with case management staff.  *Id*.  Patterson attests she never threatened to alter Smith-Bey's work status classification if he did not sign off on his ARP.  *Id*. ¶ 4.

In order to prevail on a claim of retaliation, a plaintiff "must allege either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right." *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994).

> Retaliation, though it is not expressly referred to in the Constitution, is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights. *Perry v. Sindermann,* 408 U.S. 593, 597 (1972).  Where there is no impairment of the plaintiff's rights, there is no need for the protection provided by a cause of action for retaliation.  Thus, a showing of adversity is essential to any retaliation claim.

*ACLU of Maryland, Inc. v. Wicomico County, Md.*, 999 F.2d 780, 785 (4th Cir. 1993).  A plaintiff "[b]ears the burden of showing that the conduct at issue was constitutionally protected and that the protected conduct was a substantial or motivating factor in the prison officials' decision." *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996).

To state a claim for retaliation, petitioner must demonstrate (1) the invocation of a constitutional right; (2) the intent to retaliate against him for his exercise of that right; (3) a retaliatory adverse act; and (4) causation; i.e., but for the retaliatory motive, the complained-of

incident would not have occurred.  *See Johnson v. Rodriguez*, 110 F.3d 299, 310 (5th Cir. 1997).

A prisoner has no constitutional entitlement to participate in a prison grievance process.  *See Adams v. Rice*, 40 F.3d at 75 (4th Cir. 1994).   Neither does a prisoner have a constitutional entitlement to a particular work status or prison job.  *See Altizer v. Paderick*, 569 F.2d 812, 813 (4th Cir. 1978) ("An inmate's expectation of keeping a certain prison job does not amount to a property or liberty interest entitled to protection under the Due Process Clause.").   A constitutional claim of retaliation is not supported on this record, and Patterson is entitled to summary judgment as to this claim.

## CONCLUSION

Accordingly, an order shall issue GRANTING defendants' motion for summary judgment (ECF No. 10), and ENTERING judgment in favor of defendants subject to the filing of a status report by defendants within thirty days as indicated herein.


Date:  May 16, 2016                                     _____/s/_____
                                                                          James K. Bredar
                                                                          United States District Judge